Argued and submitted August 28, reversed and remanded to LUBA with
instructions to remand to county for further proceedings
November 7, 2007

# Mark HERRING,
## Leslie Hildreth, Jesse Ulloa, and Joanne Ulloa,
### *Petitioners,*

*v.*

## LANE COUNTY,
### *Respondent.*

## Land Use Board of Appeals
## 2006203; A136155

171 P3d 1025

Jannett Wilson argued the cause for petitioners. With her on the brief was Goal One Coalition.

H. Andrew Clark argued the cause for respondent. With him on the brief were Stephen L. Vorhes and Lane County Office of Legal Counsel.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Petitioners seek review of a LUBA decision affirming respondent Lane County's amendment of its Rural Comprehensive Plan to change the designation of certain property from "agricultural" to "marginal land." As explained below, although we agree with some aspects of LUBA's decision, we conclude that the case must be remanded to the county due to its erroneous calculation, pursuant to ORS 197.247(1)(a) (1991), of whether the property was part of a forest operation capable of producing $10,000 in annual gross income.

The land in question is a 74-acre portion of a piece of property consisting of two tax lots that was originally part of a 114-acre parcel that was designated agricultural land and zoned for agricultural use at the edge of Eugene's urban growth boundary. In 1992, the northernmost 40 acres of the property were declared marginal lands and rezoned. The present case stems from an application by the owner in 2005 to change the designation of the southernmost 74 acres to marginal land and to rezone that portion of the property as well.[1] In response to that application, the county amended its Rural Comprehensive Plan to designate the property as "marginal land." Petitioners, who appeared before the county, appealed the county's decision to LUBA, arguing that the county erred in several respects. LUBA upheld the county's decision, and petitioner seeks judicial review.

Before turning to the specific arguments, we provide a background concerning the marginal lands statutory scheme and its application in Lane County. Enacted in 1983, the marginal lands statute, ORS 197.247 (1991), permitted counties to authorize procedures for designation of certain land as "marginal land" and to permit certain uses on it that otherwise would not be permitted, if the land met certain specified criteria. The criteria at issue in the present case are found in ORS 197.247(1) (1991):

"(a) The proposed marginal land was not managed, *during three of the five calendar years preceding January 1,*

---

[1] The property's owner is not a party to this proceeding.

*1983*, as part of a farm operation that produced $20,000 or more in annual gross income or a forest operation capable of producing an average, over the growth cycle, of $10,000 in annual gross income; and

"(b) The proposed marginal land also meets at least one of the following tests:

"* * * * *

"(C) The proposed marginal land is composed predominantly of soils in capability classes V through VIII in the Agricultural Capability Classification System in use by the United States Department of Agriculture Soil Conservation Service on October 15, 1983, and is not capable of producing * * * eighty-five cubic feet of merchantable timber per acre per year in those counties west of the summit of the Cascade Range, as that term is defined in ORS 477.001(21)."

(Emphasis added.)

Although the legislature repealed the marginal land statute in 1991, it enacted a statute to permit counties that had adopted marginal land procedures under that statute to continue to apply them. ORS 215.316.[2] Lane County was one of the counties that had adopted marginal land procedures, and it has continued to utilize ORS 197.247 (1991) to designate land as marginal land.

In 1997, the Lane County Board of Commissioners issued a directive concerning how it would apply ORS 197.247 (1991) ("the 1997 directive"). The 1997 directive, which is central to our review, provides, in pertinent part:

"The legislative intent of the 'management and income test' of the Marginal Lands Law was to identify those lands which were not, at the time the Marginal Lands law was enacted (1983), making a 'significant contribution' to commercial forestry. Therefore, it is appropriate and statistically valid to use the following methodology:

"1. Based on the best information available regarding soils, topography, etc., determine the optimal level of

---

[2] ORS 215.316 provides, in pertinent part, that "a county that adopted marginal lands provisions under ORS 197.247 (1991 Edition) * * * may continue to apply those provisions."

timber production for the tract assuming reasonable management.

"2. Assume that the stand was, in 1983, fully mature and ready for harvest.

"3. Using the volumes calculated in step (1), and 1983 prices, calculate the average gross annual income over the growth cycle."

Returning to the particular circumstances of this case, we draw the following facts concerning the land from the county's unchallenged findings. The land in question was designated for agricultural use and zoned E-40 (Exclusive Farm Use - 40-acre minimum) in the county's Rural Comprehensive Plan, but has never been planted in crops. A limited amount of grazing has occurred on the property, but it did not qualify as part of a "farm operation" under the first clause of ORS 197.247(1)(a) (1991). The land consists mostly of south-facing slopes, and the soil is entirely Class VI and VII and, thus, is unsuitable for farming practices. A considerable portion of the property has very shallow soils, and aerial photos establish that trees have not grown over a large portion of the land for approximately 80 years. Easements for power lines run over approximately 10 acres of the land.

The applicant retained a consulting forester, Marc Setchko, to make the necessary calculations of whether the land in question would qualify as marginal land pursuant to ORS 197.247 (1991), as interpreted by the 1997 directive. As described in the county's findings, Setchko

"presented an analysis of the timber growing potential of the Subject Property which established that it could not be managed as a forest operation capable of producing an average, over the growth cycle, of $10,000 in annual gross income. This conclusion was based on a detailed analysis of the existing soils and on-site growing conditions, their ability to grow timber (Douglas fir) and conversion of that growth potential into dollars based upon log prices in 1983. This methodology is dictated by the [1997 directive]."

Petitioners raised a variety of challenges to the correctness of the methodology prescribed by the 1997 directive and to Setchko's methodology and results, which they reiterated before LUBA and reprise on judicial review. The county

rejected those challenges, found Setchko's opinion to be persuasive, and relied on it extensively in concluding that the land should be designated marginal land:

> "We find Mr. Setchko's written analysis of the income potential for the Subject Property to be very persuasive for a number of reasons. First, Mr. Setchko's projection for income is, as a practical matter, virtually impossible to attain because it assumes a fully stocked stand of a single species. This is not realistic for this site because of the large areas of grassland and exposed rock which are not capable of growing stands of timber. Further, there is at least 9-10 acres of the site that is directly under major power lines (BPA and EWEB) which, due to provisions of the recorded easements, are not allowed to grow trees of any type. Therefore, we recognize that Mr. Setchko's estimate of $5,173 per year as the projected income for this site over a 50-year growth cycle is, as Mr. Setchko concludes, 'extremely difficult, if not impossible, to reach.' "

Specifically, in response to petitioners' arguments that Setchko's analysis was inadequate because it failed to comply with OAR 660-006-0010's directive concerning methods of determining forestland suitability, the county indicated, first, that Setchko's reports did satisfy the rule and, second, that, in any event, OAR 660-006-0010 (and the related rule OAR 660-006-0005(2)) were not directly applicable to marginal land determinations under ORS 197.247 (1991). Accordingly, the county concluded that the applicant's evidence demonstrated that the land should be designated as marginal land.

 Petitioners appealed to LUBA, asserting that the county erred in concluding that the property could qualify as marginal land as defined in ORS 197.247 (1991). In particular, petitioners argued that the county (1) erroneously failed to utilize the criteria found in OAR 660-006-0010[3] to make its determination of the amount of merchantable timber the property could produce as required by ORS 197.247(1)(b)(C) (1991); (2) erred in basing its determination about whether the property was part of a forest operation that could produce "an average, over the growth cycle, of $10,000 in annual gross

---

[3] The text of OAR 660-006-0010 is set out below. 216 Or App at 91.

income," ORS 197.247(1)(a) (1991), in 1983 timber prices; and (3) further erred in making that calculation based on a presumed 50-year timber growth cycle.

With respect to OAR 660-006-0010, LUBA agreed with petitioners that that rule applied in this context. LUBA concluded that "[d]esignating forest lands as marginal lands and amending the comprehensive plan designations and zoning for those lands from one Goal 4 designation/zone to another Goal 4 designation/zone is a modification of the county Goal 4 inventory." However, LUBA further concluded that the county's determination that OAR 660-006-0010 did not apply was not reversible error, because the county specifically found that Setchko had employed a methodology that, in fact, complied with OAR 660-006-0010 and related rules.

As to the county's use of 1983 timber prices for making its determination pursuant to ORS 197.247(1)(b)(C) (1991), LUBA followed its own precedent from *Just v. Lane County*, 49 Or LUBA 456 (2005). In *Just*, LUBA affirmed the county's decision to use 1983 timber prices, pursuant to the methodology set out in the 1997 directive.

Finally, LUBA concluded that the county's decision to use a 50-year growth cycle to calculate a forest operation's average annual income under ORS 197.247(1)(a) (1991) was appropriate. LUBA also rejected additional arguments by petitioners that are not at issue on judicial review, and affirmed the county's decision.

Petitioners seek judicial review of LUBA's affirmance of the county's decision. We write only to address petitioners' arguments concerning the applicability of OAR 660-006-0010 in the present circumstances and to consider whether the use of the 1983 timber prices is consistent with the statutory directive of ORS 197.247(1)(b)(C) (1991). We reject petitioner's remaining arguments without discussion.

As to OAR 660-006-0010, petitioners assign error to LUBA's "harmless error" holding—that is, that the county's conclusion that the rule does not apply was, albeit erroneous, harmless, given the county's further finding that, in all events, Setchko's methodology did comport with that rule. Petitioners acknowledge that the county did find that the

methodology used by Setchko comported with the rule, but assert that that finding was conclusory and not backed up by any evidence in the record of any comparison of the consultant's methodology to those required by the Department of Forestry.

The county responds with two alternative arguments. First, the county asserts that, contrary to LUBA's conclusion, OAR 660-006-0010 does not apply in this context. That is, the county contends that it was correct in the first instance. Second, the county argues that, even if the rule does apply, LUBA's "harmless error" determination must be sustained because petitioners' challenge is, in effect, a substantial evidence challenge and LUBA correctly determined that the county's finding was supported by substantial evidence.

We agree with the county that OAR 660-006-0010 does not, in fact, apply in these circumstances. Consequently, we do not reach and address the question of whether LUBA's "harmless error" rationale comported with substantial evidence review.

OAR 660-006-0010 provides:

"Governing bodies shall include an inventory of 'forest lands' as defined by Goal 4 in the comprehensive plan. *Lands inventoried as Goal 3 agricultural lands* or lands for which an exception to Goal 4 is justified pursuant to ORS 197.732 and taken *are not required to be inventoried under this rule*. Outside urban growth boundaries, this inventory shall include a mapping of forest site class. If site information is not available then an equivalent method of determining forest land suitability must be used. Notwithstanding this rule, governing bodies are not required to reinventory forest lands if such an inventory was acknowledged previously by the Land Conservation and Development Commission."

(Emphases added.)

As noted above, LUBA concluded that the rule applied to the present situation on the theory that a change "from one Goal 4 designation/zone to another Goal 4 designation/zone is a modification of the county Goal 4 inventory." Although that proposition may well be correct in the abstract, the problem with applying it to the present case, as the

county points out, is that the land at issue here was not, in fact, included in the county's Goal 4 inventory in the first instance. Rather, the county asserts—and the record confirms—that the land was included in the county's Goal 3 inventory as "agricultural land." Thus, we agree with the county that OAR 660-006-0010, by its own terms, does not apply. We thus reject petitioners' first assignment of error.

Petitioners next argue that LUBA erred in upholding the county's use of 1983 prices in making its determination of potential gross income under ORS 197.247(1)(a) (1991). As noted, the county relied on its 1997 directive, which directs that the calculation of "average gross annual income over the growth cycle" under ORS 197.247(1)(a) (1991) be made using "1983 prices." *See* 216 Or App at 87-88. LUBA concluded that the statute gave the county "some latitude" in how to perform the calculation required by ORS 197.247(1)(a) (1991), reasoning that the statute is silent as to how a county is to determine whether a forest operation is "capable of producing an average, over the growth cycle, of $10,000 in annual gross income."

■ On judicial review, the county first posits that LUBA's rationale was correct, because counties' "reasonable interpretations" of state statutes should be upheld. Suffice it to say that the authorities that the county invokes for that "reasonable interpretation" proposition do not support it. The question is simply one of statutory construction, to which we apply the well-known methodology for discerning legislative intent. We determine that intent by applying the principles of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), first examining the text of the statute in context, and, if that inquiry is inconclusive, then turning to legislative history and other aids to construction.

■ Here, the county argued, and LUBA agreed, that ORS 197.247(1)(a) (1991) did not give precise instructions as to how to make a calculation of potential annual gross income with respect to a "forest operation." The statutorily prescribed methodology with respect to a farm operation is, in contrast, unambiguous and straightforward: Was the land part of a farm operation *"that produced"* a specified amount

($20,000) of annual gross income "during three of the five calendar years preceding January 1, 1983"? Conversely, the application of the statute to a forest operation is potentially problematic in at least two respects. First, it is predicated on a determination of earning *capacity*—*i.e.*, whether the operation was "capable of producing" a certain annual gross income—rather than whether it actually did so. Second, the forest operation's potential annual gross income is to be determined by "averag[ing], over the growth cycle." The growth cycle of a forest, obviously, does not correlate to "the five calendar years preceding January 1, 1983," much less to "three of the five calendar years preceding January 1, 1983."

LUBA recognized those methodological difficulties, observing:

> "For forest operations, the question is whether the subject property was managed as part of a forest operation during three of five years between 1978 and 1982 that was *capable* of producing an average annual gross income, over the growth cycle. Because forest operations do not produce annual revenue, the analysis of forest operations is necessarily more hypothetical than for farm operations, and the significance of the five-year period is less clear. The statute is simply silent as to how that five-year period is applied in determining whether the forest operation is 'capable of producing an average, over the growth cycle, of $10,000 in annual gross income.' "

(Emphasis in original.) LUBA went on to conclude that the county's reliance, in the 1997 directive, on the 1983 prices represented a reasonable and permissible resolution of those difficulties:

> "The legislature adopted the marginal lands statute in mid-1983, and it is reasonable to assume that the $10,000 threshold is expressed in 1983 dollars, not $10,000 in 1978 dollars or an average of dollar values during the years 1978-82. If so, then it also seems reasonable to assume that the legislature did not intend to preclude use of 1983 log prices to determine whether the forest operation exceeds the $10,000 threshold."

We agree with LUBA's overarching observation that the statutory text, when viewed in context, does not provide precise guidance as to how the calculation concerning gross

annual income of forest operations is to be performed. However—and contrary to LUBA's affirmance of the county's reliance on 1983 prices—the statute is *not* unclear as to what years' timber prices are relevant to the calculation.

To reiterate, ORS 197.247(1)(a) (1991) provides:

> "The proposed marginal land was not managed, *during three of the five calendar years preceding January 1, 1983*, as part of a farm operation that produced $20,000 or more in annual gross income or a forest operation capable of producing an average, over the growth cycle, of $10,000 in annual gross income."

(Emphasis added.) The pertinence of "the five calendar years preceding January 1, 1983" is clear with respect to calculating the annual gross income of a farm operation: To qualify as marginal land, the land must not have been managed, during any three of the five years before January 1, 1983, as part of a farm operation that produced $20,000 or more in annual gross income in those years. Thus, if the land was managed as part of a farm operation in 1978, 1979, 1980, 1981, and 1982, and annual gross income exceeded $20,000 only in the latter two years, the land would satisfy the marginal lands "farm operation" income (or lack of income) criterion of ORS 197.247(1)(a) (1991).

The qualifying phrase "the five calendar years preceding January 1, 1983" applies equally, and functionally, to the statutorily prescribed calculation with respect to forest operation-related income. That is so because, as a matter of syntax, the legislature employed a parallel structure, rendering that qualifying phrase equally applicable to both farm and forest income. *See* Bryan A. Garner, *A Dictionary of Modern American Usage* 479 (1998) (Parallelism: "By phrasing parallel ideas in parallel grammatical constructions, you show the reader how one idea relates to another."); *cf. Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992) (parallel construction in separate sentences of same constitutional provision indicated references were to same subject matter).

Given that principle of parallel construction, the statutory text provides that the calculation of potential annual gross income of a forest operation, like that for a farm operation, is to be based on the five calendar years preceding

January 1, 1983—*i.e.*, 1978, 1979, 1980, 1981, and 1982. Although the statute is silent on some aspects of how one is to determine what a forest operation could potentially have produced in annual gross income in those particular years, it is explicit as to the years on which that calculation must be based.[4] Certainly, nothing in the text or context of the statute suggests that *1983* prices—prices for the year *following* January 1, 1983—are properly considered in determining compliance with the marginal lands income requirement. In sum, ORS 197.247(1)(a) (1991) unambiguously requires that the calculation of potential annual gross income be based on the five calendar years preceding 1983, rather than on 1983.[5]

We note, finally, that, in rejecting petitioners' challenge to reliance on the 1983 timber prices, LUBA made an additional observation, suggestive of an alternative basis for affirmance:

> "In any case, as the county notes, the applicants' consulting forester made an alternative calculation that used the 1978-82 log prices suggested by petitioners. While the result was higher than using 1983 log prices, the average annual income still fell below $10,000."

LUBA concluded that petitioners' arguments "provide no basis for remand."

To the extent that the county suggests on judicial review that LUBA's ultimate conclusion may be affirmed based on that alternative rationale, we disagree. Evidence in the record indicates that Setchko did, indeed, make alternative calculations of annual gross income based on 1978

---

[4] That is to say, the statute may well be ambiguous as to some details of how the legislature intended the potential annual income to be calculated, such as whether the legislature intended the calculation to be based on trees hypothetically harvested in 1978 through 1982 or, perhaps, on the projected value of trees actually existing on the land in 1978 through 1982. Those questions, however, are not presented in this case, and ambiguities in one aspect of a statute do not necessarily render all aspects of a statute ambiguous.

[5] We note, parenthetically, that the limited legislative history on this point confirms that construction. *See, e.g.*, Tape Recording, House Committee on Energy and Environment, SB 237, Apr 25, 1983, Tape 260, Side A (testimony of Richard Benner) (indicating that, for the income test, "you use the five-year period preceding the effective date of the Act"); *id.* (statement of Committee Chair Darlene Hooley) (the income test involves "averaging of gross income in three of the five years preceding the effective date of this Act—1983").

through 1982 log prices. However, the county's findings were not based on those calculations; instead, the county's approval of the application was expressly based on Setchko's calculations that used 1983 prices. Given our respective review functions, and given that the county never purported to rely on Setchko's alternative calculations, neither we nor LUBA can affirm on an alternative basis that there is other evidence in the record, which might, if accepted by the local decision-maker, have been sufficient to support its initial determination. *See Newcomer v. Clackamas County*, 92 Or App 174, 184-85, 758 P2d 369, *adh'd to as modified on recons*, 94 Or App 33, 764 P2d 927 (1988) (court will not presume that county would have made a finding that it did not, in fact, make).

Reversed and remanded to LUBA with instructions to remand to county for further proceedings.